

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| MELISSA McGAW, | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | WD77799 |
| | ) | |
| ANGELA McGAW, | ) | **FILED:** August 18, 2015 |
| Respondent. | ) | |

**Appeal from the Circuit Court of Clay County**
**The Honorable Kathryn E. Davis, Judge**

**Before Division Four: Alok Ahuja, C.J., Lisa White Hardwick, J. and**
**Robert M. Clayton III, Sp.J.**

Appellant Melissa McGaw filed a motion in the circuit court "to determine parent-child relationship, custody, and visitation" with respect to two children to whom she is not biologically related. The children were born at a time when Melissa[1] was involved in a romantic relationship with the children's biological mother, respondent Angela McGaw. Melissa's motion alleged that she had participated in Angela's decision to become pregnant with the children, and that Melissa had acted as a parent to the children, both before and after her relationship with Angela terminated. The circuit court dismissed Melissa's motion without prejudice for lack of standing and failure to state a claim upon which relief could be granted. Melissa appeals. We affirm.

---

[1] Because the parties share the same surname, we refer to them by their first names to avoid confusion. No familiarity or disrespect is intended.

## Factual Background

Taking the facts Melissa alleged as true, she and Angela started dating in 1995, and began cohabiting the following year. In 1997, the couple had a commitment ceremony in Kansas City, and in 2000 Angela legally changed her last name to McGaw. The McGaws bought a home together, and by 2002 had decided to have children.

In 2004, Angela gave birth to twins in Kansas City. The children were conceived using sperm from an anonymous donor jointly selected by Melissa and Angela. From 2004 to 2007, Angela and Melissa raised the children together as co-parents.

Angela and Melissa separated in January 2007, and Melissa moved out of the shared household. Melissa alleged that she and Angela agreed to a schedule for visitation with the children, and a division of property, through mediation. Although separated, Melissa and Angela continued to share expenses for the children and to follow a visitation schedule until June 2013. At that time, Angela stopped allowing Melissa to see the children, and sent Melissa a text message stating that "[the children] will be living at my house until the parenting plan issue is resolved. I will call the police if you try to come and get them." Melissa has not seen the children since that time.

On March 7, 2014, Melissa filed a Motion to Determine Parent-Child Relationship[2] in the Circuit Court of Jackson County, seeking "to determine parent-child relationship, custody, and visitation" pursuant to § 210.826.[3] Angela filed an application for a change of venue to Clay

---

[2] Although Melissa's initial pleading was captioned as a "Motion," it commenced a civil action and served the function of a petition. Regardless of the label Melissa placed on her pleading, "'[i]t is the facts stated in the petition, along with the relief sought, which under our system of code pleading are to be looked at to determine the cause of action, rather than the form of the petition.'" *Am. Eagle Waste Indus., LLC v. St. Louis Cnty.*, 379 S.W.3d 813, 829 (Mo. banc 2012) (quoting *Memco, Inc. v. Chronister*, 27 S.W.3d 871, 875 (Mo. App. S.D. 2000)).

[3] Statutory citations refer to the 2000 edition of the Revised Statutes of Missouri, as updated through the 2013 Cumulative Supplement.

County, which the court granted. In addition to her answer, Angela filed a motion to dismiss, arguing that Melissa had no biological relationship to the children and therefore lacked standing to assert her claims, and that Melissa's pleading failed to state a claim for relief.

In her suggestions in opposition to Angela's motion to dismiss, Melissa argued that she had standing under Missouri's version of the Uniform Parentage Act ("MoUPA"), §§ 210.817 – 210.854, and that she had standing under common-law equitable doctrines defining parentage.

A commissioner recommended that the action be dismissed on the basis that Melissa lacked standing and failed to state a claim upon which relief could be granted. A circuit court judge adopted the commissioner's findings and recommendations and entered judgment dismissing Melissa's motion without prejudice. This appeal follows.

### Standard of Review

> Our review of a dismissal for failure to state a claim or for lack of standing is *de novo.* When reviewing for failure to state a claim, we treat the facts contained in the petition as true and construe them liberally in favor of the plaintiffs. The petition states a cause of action if it sets forth any set of facts that, if proven, would entitle the plaintiffs to relief. Similarly, this court determines standing as a matter of law on the basis of the petition, along with any other non-contested facts accepted as true by the parties at the time the motion to dismiss was argued, and resolves the issue as a matter of law on the basis of the undisputed facts.

*White v. White*, 293 S.W.3d 1, 8 (Mo. App. W.D. 2009) (citations and internal quotation marks omitted).

### Analysis

At the outset, we note that the McGaws' relationship began, and ended, at a time when the right of same-sex couples to marry had not been recognized in Missouri. Despite their inability to marry, Melissa's motion alleges that she and Angela took multiple steps to formalize their relationship: they participated in a commitment ceremony; changed Angela's surname to match Melissa's; purchased a home together; jointly chose to conceive the children and raised

3

the children together; and entered an agreement to govern the termination of their relationship. Nevertheless, the fact remains that Melissa and Angela were never married, and – as our decision in *White* recognized – Melissa's claims must therefore be addressed under the legal rules applicable to unmarried couples (heterosexual or homosexual). Following the decision of the Supreme Court of the United States in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) (which was decided after this case was submitted), couples like Melissa and Angela are now able to marry if they choose. We anticipate that in the wake of *Obergefell*, situations like this one, in which important issues involving children must be decided outside the established legal framework applicable to married couples, will occur less frequently.[4]

On appeal, Melissa does not challenge the circuit court's dismissal of her claim to have her parentage established under the MoUPA. Instead, she argues that she stated a claim for relief based on theories of breach of contract, or under common-law equitable doctrines. For the reasons discussed below, we conclude that none of those theories justifies reversal.[5]

---

[4]     Although she argues constitutional issues on appeal, Melissa made no argument in the trial court that denying her the right to marry, or denying her the parental status and remedies available to married persons, was unconstitutional. Because she did not make these constitutional arguments in the trial court, no constitutional issue (which might otherwise have invoked the exclusive appellate jurisdiction of the Missouri Supreme Court) is preserved for review. *See*, *e.g.*, *Mayes v. St. Luke's Hosp. of Kansas City*, 430 S.W.3d 260, 267-69 (Mo. banc 2014); *State ex rel. SLAH, L.L.C. v. City of Woodson Terrace*, 378 S.W.3d 357, 362 n.5 (Mo. banc 2012).

[5]     We note that the circuit court in this case dismissed Melissa's motion without prejudice. "The general rule is that a dismissal without prejudice is not a final judgment and, therefore, is not appealable." *White v. White*, 293 S.W.3d 1, 7 (Mo. App. W.D. 2009). "An exception to this general rule" applies, however, "where the dismissal has the practical effect of terminating the litigation in the form cast by the plaintiff." *Balke v. Ream*, 983 S.W.2d 579, 580 (Mo. App. W.D. 1998). "A dismissal 'without prejudice' for failure to state a claim effectively bars a plaintiff from refiling the action in its original form." *WEA Crestwood Plaza, L.L.C. v. Flamers Charburgers, Inc.*, 24 S.W.3d 1, 5 (Mo. App. E.D. 2000). Further, "[d]ismissals without prejudice have been held appealable where the dismissal was based on a plaintiff's lack of standing or failure of the petition to state a claim where the plaintiff chose not to plead further." *White*, 293 S.W.3d at 7 (citations and internal quotation marks omitted). Here, all of the claims in Melissa's initial motion were dismissed for lack of standing and failure to state a claim upon which relief could be granted. As such, it would be futile for her to attempt to refile her petition in its original form. Moreover, Melissa has chosen not to plead further on any of the causes of action

4

# I.

In her first Point, Melissa argues that the circuit court erred in dismissing her motion because she stated a claim to enforce a voluntary agreement between her and Angela governing visitation. Such agreements are enforceable, Melissa contends, so long as the trial court determines that the visitation agreement serves the best interests of the children.

"To properly plead a cause of action, the petition must state allegations of fact in support of each essential element of the cause pleaded." *Am. Eagle Waste Indus., LLC v. St. Louis Cnty.*, 379 S.W.3d 813, 829 (Mo. banc 2012) (citation and internal quotation marks omitted). A petition for breach of contract requires a plaintiff to "allege (1) the existence of a contract or agreement and the terms of that agreement; (2) that plaintiff performed or tendered performance; (3) that defendant did not perform; and (4) that defendant's failure to perform caused plaintiff damage." *White,* 293 S.W.3d at 23 (citation and internal quotation marks omitted).

Melissa's motion failed to adequately plead a breach of contract theory under these standards. Our decision in *White* involved circumstances strikingly similar to those in the present case, and *White* guides our resolution of many of Melissa's claims, including her breach of contract claim. In *White*, plaintiff Leslea Diane White, alleged (among other things) that she and defendant Elizabeth Michelle White had agreed to jointly support their children, but that Michelle had refused to comply with that agreement. *Id.* at 23.

*White* held that Leslea had failed to adequately plead a claim for breach of a child support agreement, and had failed to preserve for appeal the argument that she had stated a claim for breach of such an agreement. *White* noted that Leslea "did not expressly denominate any count of her petition as seeking relief for breach of a contract for support," and that "despite her

asserted in her original motion. We therefore conclude that the dismissal of her motion is appealable, despite the fact that it was denominated a dismissal without prejudice.

5

copious briefing and argument in opposition to Michelle's motion to dismiss in the trial court, Leslea never explicitly invoked the express contract theory as a basis to sustain her claim for child support." *Id.* *White* emphasized that, "[e]ven assuming that the allegations in the petition are sufficient to allege that Michelle entered into a contract with Leslea to provide on-going support . . ., they still fail to state the length of time for such support to continue or that Michelle has failed to provide the financial support required by the agreement." *Id.*

Melissa's motion suffers from the same sort of pleading inadequacies as the petition in *White*. The motion alleged that "[f]ormal mediation determined visitation" at the time of the parties' separation, and that "until June 13, 2013, Melissa and Angela followed a set visitation schedule, Melissa paid preschool tuition costs every other week and both parents shared equally in child-rearing activities and expenses." The motion is silent, however, as to the *terms* of the separation agreement as they relate to visitation, or as to what the parties' "set visitation schedule" was. Moreover, the prayer of Melissa's motion did not seek to enforce any pre-existing agreement between the parties. Instead, she asked the court to determine her parentage of the children, and to "award the parties joint legal custody of their minor children, specify rights of visitation to the Plaintiff, award child support and enter such other orders as the court may deem just and necessary and in the best interests of the minor children." The motion plainly asked the court to declare that she was a parent of the children, and based on that finding to order custody, visitation, and child support on terms the court deemed appropriate. The motion did not ask the court to enforce a preexisting agreement. In addition, as in *White*, Melissa did not argue that she had stated a claim for breach of an express agreement in opposition to Angela's motion to dismiss.

Like the plaintiff in *White*, Melissa has failed to adequately plead a claim for breach of contract; as in *White*, "[i]n these circumstances, we will not reverse the trial court's dismissal of the petition" based on a breach of contract argument. 293 S.W.3d at 23. Point I is denied.

## II.

In her second Point, Melissa argues that she has standing to seek custody or visitation under the doctrines of *in loco parentis* or equitable parentage.

The *in loco parentis* and equitable parentage doctrines share certain characteristics with other equitable theories which have been developed to address the parental status of third parties who are not biological parents, but who have assumed significant parental roles in children's lives. *White* refused to adopt either the *in loco parentis* or equitable parentage theories in a case factually similar to this one. 293 S.W.3d at 14-16. As background, *White* quoted the Wisconsin Supreme Court's decision in *In re Custody of H.S.H.-K.*, 533 N.W.2d 419 (1995), for a commonly used definition of the circumstances in which recognition of parental status based on equitable considerations may be appropriate:

> (1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child; (2) that the petitioner and the child lived together in the same household; (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; and (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

*Id.* at 435-36 (quoted in *White*, 293 S.W.3d at 14).

We turn now to the two specific theories Melissa invokes in her second Point.

**A.**

*White* addressed the *in loco parentis* doctrine under Missouri law. "*In loco parentis*" is a Latin phrase meaning "in the place of a parent." BLACK'S LAW DICTIONARY at 907 (10th ed. 2014).

In *White*, Leslea argued that "she and Michelle [stood] *in loco parentis* to each other's biological child because they jointly raised the children with each other's consent, and treated each child, and held each child out to the world, as the children of both of them." 293 S.W.3d at 15. Although older Missouri cases recognized an *in loco parentis* relationship between stepparents and stepchildren, which survived the termination of the stepparent's relationship with the biological parent, *White* held that this common-law doctrine had been "displaced" by § 453.400. *Id.* The statute provides that an *in loco parentis* support obligation exists only "so long as the stepchild is living in the same home as the stepparent," § 453.400.1, and that the doctrine "shall not be construed as granting to a stepparent any right to the care and custody of a stepchild." § 453.400.4; *see* discussion in *White*, 293 S.W.3d at 15-16. Because it concluded that § 453.400 expressed the outer limits of the *in loco parentis* doctrine, *White* held that, whether or not Leslea stood *in loco parentis* to Michelle's child while she and Michelle lived together, "that status terminated when they separated and would deprive Leslea of standing to bring her action," and could not support a claim for child custody, visitation, or support. *Id.* at 16.

Melissa argues that *White* was incorrectly decided. Unless and until it is overruled by this Court or the Missouri Supreme Court, however, we are bound to follow *White* under principles of *stare decisis*.

> "The doctrine of *stare decisis* directs that, once a court has laid down a principle of law applicable to a certain state of facts, it must adhere to that principle, and apply it to all future cases, where facts are substantially the same; regardless of whether the parties and

8

property are the same." Under the doctrine, "a court follows earlier judicial decisions when the same point arises again in litigation and where the same or analogous issue was decided in an earlier case, such case stands as authoritative precedent unless and until it is overruled."

*Hinkle v. A.B. Dick Co.*, 435 S.W.3d 685, 688 (Mo. App. W.D. 2014) (quoting *Rothwell v. Dir. of Revenue*, 419 S.W.3d 200, 206 (Mo. App. W.D. 2013)). Particularly given that Melissa has, and is presently pursuing, an alternative remedy to seek custody and/or visitation with the children (as discussed in § II.B below), we see no justification for re-examining *White*'s treatment of the *in loco parentis* doctrine.[6]

**B.**

Regarding her equitable parentage claim, Melissa contends that *White* "incorrectly determined that Missouri Supreme Court precedent does not allow individuals to seek custody or visitation as equitable parents," and should be overruled. To the contrary, we conclude that the justification for rejecting an equitable parentage argument is stronger today than at the time *White* was decided.

In *White*, the Court observed that it was "unaware of any Missouri appellate court decision adopting the concept or theory of an 'equitable parent.'" 293 S.W.3d at 15 n.8. Although *White* did not read *Cotton v. Wise*, 977 S.W2d 263 (Mo. banc 1998), as refusing to adopt the equitable parentage theory, it noted that "*Cotton* did not adopt the theory in a case where doing so would have permitted it to affirm the trial court's decision without need for

---

[6]     Melissa contends that this court's decision in *Thacker v. Thacker*, 311 S.W.3d 402 (Mo. App. W.D. 2010), supports overruling *White*. *Thacker* held that § 453.400 did not preclude a stepparent from being ordered to pay support for a stepchild who was no longer living in his home (and thus outside the scope of the statutory obligation), if the stepparent had contractually agreed to support the child, or under an estoppel theory. *Id*. at 407-08. Thacker dealt only with support obligations, however, not child custody or visitation. Moreover, *Thacker*'s recognition that a *voluntary agreement* to provide child support could be enforceable, or that a party could be estopped from denying a support obligation, despite § 453.400 is not inconsistent with *White*. *White* held only that an *in loco parentis claim* which was independent of any estoppel argument, or of any child support or visitation agreement, could not be maintained.

reversal and remand." 293 S.W.3d at 15 n.8. *White* also noted that, in a decision authored by Judge Mary Russell, now a member of the Missouri Supreme Court, the Eastern District interpreted *Cotton* as having affirmatively rejected the equitable parentage theory. *Id.* (discussing *Jefferson v. Jefferson*, 137 S.W.3d 510, 513-14 (Mo. App. E.D. 2004)). Following its discussion of *Cotton* and *Jefferson*, *White* concluded: "Accordingly, even if we were inclined to accept Leslea's invitation [to recognize equitable parentage], we would not feel entirely confident that our decision conforms with the most recent decisional authority of the Missouri Supreme Court." 293 S.W.3d at 15 n.8.[7]

Although *White* may be equivocal concerning the viability of the equitable parentage theory under Missouri law, we read it as rejecting the application of that theory in circumstances strikingly similar to those involved in the present case. The equitable parentage theory was raised by the appellant in *White*, and would have justified reversal and a remand for further proceedings if the equitable parentage doctrine in fact established a viable cause of action under Missouri law. Despite the appellant's invocation of the equitable parentage doctrine, *White* affirmed the trial court's dismissal of the appellant's petition, in which she sought to be recognized as a (non-biological) parent of the child of her former romantic partner.

_____

[7] Subsequent to *White*, we addressed Missouri's application of equitable principles to establish parentage in *Courtney v. Roggy*, 302 S.W.3d 141 (Mo. App. W.D. 2009). In *Courtney*, the circuit court declared the paternity of a man who was conceded to be a child's biological father. Despite the acknowledged biological relationship, the child's mother and her husband argued that the biological father's right to claim paternity should be foreclosed based on equitable principles. *Courtney* refused to rely on equitable principles to foreclose the biological father's statutory right to establish his paternity. *Courtney* observed that, in *Jefferson*, "[t]he Eastern District of this court concluded that the courts should not impose a judicially constructed doctrine such as 'equitable parent' [or 'equitable non-parent'] unless the statutory remedies were clearly inadequate." *Courtney*, 302 S.W.3d at 150, citing *Jefferson*, 137 S.W.3d at 513. *Courtney* "reject[ed] the invitation from appellants to unreasonably stretch the facts of [the] case into an equitable declaration of non-paternity, especially in light of the fact that [the Missouri statute in question] is clear and unambiguous and does not leave room for appellants['] equitable non-parent argument." 302 S.W.3d at 150.

An additional consideration, arising subsequent to the *White* decision, likewise justifies rejection of the equitable parentage theory under Missouri law. As the Missouri Supreme Court noted in *Cotton* (in which the appellant asked the Court to recognize equitable parentage), "[u]nless a statutory scheme is plainly inadequate under circumstances where a court has a duty to act, there is no need for the court to exercise its equity powers to fashion a 'better' remedy than exists in the statutes." 977 S.W.2d at 264; *see also*, *e.g.*, *Courtney*, 302 S.W.3d at 141; *Jefferson*, 137 S.W.3d at 513, 517.

In this case, Melissa has an available statutory remedy under § 452.375.5(5) to assert her claims for child custody and visitation. Section 452.375.5(5) provides in relevant part that

> Prior to awarding the appropriate custody arrangement in the best interest of the child, the court shall consider each of the following as follows:
>
> * * * *
>
> (5) Third-party custody or visitation:
>
> (a)     When the court finds that each parent is unfit, unsuitable, or unable to be a custodian, or the welfare of the child requires, and it is in the best interests of the child, then custody, temporary custody or visitation may be awarded to any other person or persons deemed by the court to be suitable and able to provide an adequate and stable environment for the child. Before the court awards custody, temporary custody or visitation to a third person under this subdivision, the court shall make that person a party to the action;
>
> (b)     Under the provisions of this subsection, any person may petition the court to intervene as a party in interest at any time as provided by supreme court rule.

"[A] significant bonding familial custody relationship with third parties can constitute a special or extraordinary reason or circumstance rendering it in a child's best interest to award third-party custody" under § 452.375.5(5)(a)'s "welfare of the child" prong. *Flathers v. Flathers*, 948 S.W.2d 463, 470 (Mo. App. W.D. 1997).

*White* rejected the appellant's claim that she could obtain a determination of child custody and visitation under § 452.375.5(5). After citing the statute, *White* stated emphatically that "[n]either our statutes nor our case law remotely suggest that any third party that comes along has standing to bring an action seeking custody of children." 293 S.W.3d at 18. *White* concluded that

> a third party's foundational standing to litigate custody or visitation is dependent upon the third party being a named party in an action brought by someone else (parent, Juvenile Officer) or being permitted to intervene in a pending action (dissolution) or in cases where the third party already has something other than *de facto* custody (decretal custody).

293 S.W.3d at 21.

Subsequent to *White*, however, the Missouri Supreme Court decided *In re T.Q.L.*, 386 S.W.3d 135 (Mo. banc 2012). In *T.Q.L.*, a male petitioner, believing he was a child's natural father, filed a petition for declaration of paternity, custody, and visitation. *Id.* at 137. A paternity test determined, however, that the petitioner was not the biological father, and the circuit court dismissed his petition for failure to state a claim. *Id.* at 137-38. The petitioner appealed, and the court of appeals reversed, holding that the petitioner was entitled to file an amended petition asserting a right to custody under equitable estoppel and equitable parentage theories. *T.Q.L. ex rel. M.M.A. v. L.L.*, 291 S.W.3d 258, 268 (Mo. App. S.D. 2009).

On remand, the *T.Q.L.* petitioner filed an amended petition. *T.Q.L.*, 386 S.W.3d at 138. The child's mother filed a motion to dismiss, arguing that the amended petition "failed to state a claim under the Uniform Parentage Act and that Missouri law did not support claims of equitable parentage." *Id.* at 138. The circuit court granted the motion to dismiss, and petitioner again appealed.

The Supreme Court did not address the petitioner's argument that he could assert a claim for equitable parentage, even though he was not biologically related to the child. 386 S.W.3d at

12

140 n.3. Instead, the Court held that dismissal was inappropriate because the petitioner had adequately stated a claim for relief under § 452.375.5(5):

> Petitioner's third amended petition was sufficient to meet the requirements of section 452.375.5(5)(a) because it alleged the unfitness of Child's biological parents and that awarding Petitioner custody of Child would be in Child's best interest. In addition to Petitioner's sufficient allegations of Mother's and the unknown father's unfitness, his petition to transfer custody survives a motion to dismiss because he alleges facts that the "welfare of the child requires" that custody be vested in a third party pursuant to section 452.372.5(5)(a). This Court does not weigh the credibility and persuasiveness of the facts Petitioner alleged in his petition but acknowledges that those facts meet the elements of section 452.375.5(5)(a), and for that reason, the petition will be reinstated.

386 S.W.3d at 140.[8]

Notably, the *T.Q.L.* petitioner's § 452.375.5(5) claim did not meet any of the scenarios identified in *White* in which a third party could assert custody or visitation rights: the petitioner in *T.Q.L.* was not "a named party in an action brought by someone else," nor was he "permitted to intervene in a pending action," nor was it a case in which the petitioner already had "something other than *de facto* custody." *White*, 293 S.W.3d at 21. Because it held that the petitioner could assert a § 452.375.5(5) claim in circumstances beyond those contemplated by *White*, *T.Q.L.* necessarily overruled *White*'s construction of § 452.375.5(5).

This Court has recognized that under *T.Q.L.*, § 452.375.5(5) provides a basis for a non-biological parent to commence an action seeking child custody and visitation. In *D.S.K. ex rel. J.J.K. v. D.L.T.*, 428 S.W.3d 655 (Mo. App. W.D. 2013), a husband sought to intervene in a paternity action filed by his wife. The wife's paternity action prayed for a declaration that her deceased paramour was the father of three children born during her marriage to husband. *Id.* at

---

8      Judge Clayton's separate opinion suggests that it is "less clear[ ]" whether, under *T.Q.L.*, a third party may bring an independent action under § 452.375.5(5)(a)'s "welfare" prong, as opposed to bringing an action based on the parents' "unfitness." The quoted passage reflects, however, that *T.Q.L.* found that petitioner had stated a claim under *both* "unfitness" and "welfare" theories. *T.Q.L.* draws no distinction between these two theories with respect to a third party's ability to bring an independent action under § 452.375.5(5).

656. Although husband was excluded by paternity testing as the children's biological father, he moved to intervene in the paternity action to assert claims for third-party custody and visitation. *Id.* at 657.

*D.S.K.* rejected husband's contention that he was entitled to intervene in the paternity action, based on our conclusion that child custody and visitation were not at issue in the paternity case. *Id.* at 658-59. Based on *T.Q.L.*, we also rejected husband's argument that the paternity action was the only available forum in which he could raise his claims to third-party custody and visitation. We explained:

> Husband argues . . . that the paternity case is the only action in which he can assert his third-party custody claim, because he cannot assert it in the dissolution of marriage case. We agree with Husband that the court does not have the authority in a dissolution proceeding to determine the custody of children not born of the marriage or adopted by the parties. Merely because Husband cannot assert his third-party custody claim in the dissolution proceeding does not foreclose him from raising it in a separate action. In *In re T.Q.L.*, 386 S.W.3d 135 (Mo. banc 2012), the Missouri Supreme Court found that the appellant's petition, in which he asserted a claim for third-party custody, sufficiently stated such a cause of action under Section 452.375.5(5)(a).
>
> Thus, although Husband failed to establish that he had an interest in the paternity case entitling him to intervene as a matter of right, nothing prevents him from asserting his third-party custody claim as an independent cause of action.

*Id.* at 659-60 (other citations and footnotes omitted); *see also id.* at 660 n.7 ("Pursuant to *T.Q.L.*, an independent action for third-party custody is permissible.").

We recognize that in *In re Adoption of C.T.P.*, 452 S.W.3d 705 (Mo. App. W.D. 2014), this Court expressed "reservation[s]" concerning a reading of *T.Q.L.* that authorized a third party to file an independent action to assert a claim for child custody or visitation under § 452.375.5(5). *Id.* at 720-21. In a footnote, this court noted that

> *T.Q.L.* made no reference to the decision in *White*. *T.Q.L.* did not mention any of the earlier appellate and Supreme Court decisions discussed in *White* addressing the narrow circumstances wherein a trial court is authorized to determine third-party child custody and visitation rights. Nor did *T.Q.L.* engage in customary statutory construction

14

analysis to assess whether the legislature intended section 452.375.5(5) to authorize original proceedings to determine third-party child custody and visitation rights.

*C.T.P.*, 452 S.W.3d at 721 n.33.

While we acknowledge the concerns expressed by *C.T.P.*, we are "constitutionally bound to follow the most recent controlling decision of the Missouri Supreme Court." *Christianson v. Goucher*, 414 S.W.3d 584, 592 (Mo. App. W.D. 2013), quoting *Doe v. Roman Catholic Diocese of St. Louis,* 311 S.W.3d 818, 822 (Mo. App. E.D. 2010); *see* Mo. Const. art. V, § 2 (specifying that the Missouri Supreme Court's "decisions shall be controlling in all other courts"). *C.T.P.* itself candidly "acknowledge[d] . . . that *T.Q.L.* does not offer a clear basis for constraint of its holding to the facts in that case." 452 S.W.3d at 721 n.33. Moreover, although both *T.Q.L.* and *D.S.K.* held that § 452.375.5(5) provided a third party with an independent right of action, *C.T.P.* did not decide the issue, but held only that "an interest in child custody or visitation is not sufficient to support intervention as a matter of right in an adoption proceeding where child custody determinations are not 'in issue.'" *Id.* at 721. The *dictum* in *C.T.P.* cannot excuse us from recognizing and following the holding of *T.Q.L.*, and of our own decision in *D.S.K.*[9]

Recognizing that Melissa may pursue an independent action to assert custody and visitation rights over children to whom she is not biologically related does not run afoul of the Supreme Court of the United States' decision in *Troxel v. Granville,* 530 U.S. 57 (2000). The

---

[9] We also note that *In re E.N.C.*, 458 S.W.3d 387 (Mo. App. E.D. 2014), the Eastern District reversed a circuit court order which permitted a biological grandmother to intervene in an adoption proceeding for purposes of obtaining visitation. The circuit court had concluded "that Section 452.375.5(5)(b) afforded Grandmother 'the right to intervene in a custody proceeding as a party in interest at any time as provided by supreme court rule.'" *Id.* at 400 (quoting circuit court's order). To the contrary, the Eastern District held that § 452.375.5(5) had no application in an adoption proceeding brought pursuant to chapter 453 of the Revised Statutes. *Id.* at 401-05. In the course of its discussion, *E.N.C.* cited and discussed *White*, *id.* at 401-02, concluding that under *White*, "Section 452.375.5 provides that a third party may intervene in a case in which custody is at issue, only in a dissolution of marriage action or a modification of a dissolution proceeding." *Id.* at 402. *E.N.C.* held only that § 452.375.5 did not provide a statutory right to intervene in a chapter 453 adoption proceeding. In addition, *E.N.C.* does not cite or discuss *T.Q.L. E.N.C.* is not inconsistent with our construction of *T.Q.L.* in this case.

15

State of Washington statute at issue in *Troxel* permitted "'[a]ny person' to petition a superior court for visitation rights at 'any time,' and authorize[d] that court to grant such 'visitation rights whenever visitation may serve the best interest of the child.'" *Id.* at 60. *Troxel* held that this "breathtakingly broad" statute violated a biological mother's substantive due process right to make child-rearing decisions without undue governmental interference. *Id.* at 67.[10]

Section 452.375(5), as interpreted by Missouri courts, is limited in important respects that were not present in *Troxel*. First, in contrast to the Washington statute at issue in *Troxel*, § 452.375.5(5) does not authorize third-party custody or visitation merely because a court determines that it would be in a child's best interests. Instead, the court must first find that the child's parents are "unfit, unsuitable, or unable to be a custodian," or that "the welfare of the child" requires third-party custody or visitation. "Courts should not treat the term 'welfare' used in section 452.375.5(5)(a) as the equivalent of 'best interests.' Rather, the two are separate and distinct findings, and 'welfare' implicates pleading and proving special or extraordinary

---

[10]       There was no majority opinion in *Troxel*. Instead, Justice O'Connor issued a plurality opinion in which three other justices joined, and Justices Souter and Thomas concurred in the result, and each issued their own opinions. As discussed in the text, Justice O'Connor's plurality opinion found the State of Washington statute at issue in that case to be unconstitutional as applied, based on consideration of multiple factors. Thus, the plurality emphasized that the Washington courts had made no finding that the child's natural parent was unfit, and had applied no presumption in favor of the parent's decision concerning third-party visitation; in addition, the plurality noted that the parent had not wholly denied visitation to the child's paternal grandparents. 530 U.S. at 68-71. Justice Souter would have found the Washington statute to be "unconstitutional on its face." *Id.* at 77. He concluded that the statute unduly infringed on the parent's right to determine the appropriate care, custody, and control of her children because it "sweeps too broadly" by authorizing "'any person' at 'any time' to petition for and to receive visitation rights subject only to a free-ranging best-interests-of-the-child standard." *Id.* at 76-77. Justice Thomas' concurring opinion argued that the statute should be subject to strict scrutiny, and concluded that "the State of Washington lacks even a legitimate governmental interest – to say nothing of a compelling one – in second-guessing a fit parent's decision regarding visitation with third parties." *Id.* at 80.

Because Justice O'Connor's plurality opinion found the Washington statute to be unconstitutional only as applied on the facts of that case, we believe it represents the views of those justices "who concurred in the judgments on the narrowest grounds," and that the plurality opinion therefore represents the holding of the Court. *Marks v. United States*, 430 U.S. 188, 193 (1977) (citation and internal quotation marks omitted). We note that the Missouri Supreme Court treated Justice O'Connor's plurality opinion as authoritative in *Blakely v. Blakely*, 83 S.W.3d 537, 542-43 (Mo. banc 2002).

16

circumstances that make third-party custody or visitation in the child's best interest." *T.W. ex rel. R.W. v. T.H.*, 393 S.W.3d 144, 150 (Mo. App. E.D. 2013).

Further, *Troxel* held that the Washington statute "contravened the traditional presumption that a fit parent will act in the best interest of his or her child." 530 U.S. at 69. "[I]f a fit parent's decision [to deny or limit visitation with third parties] becomes subject to judicial review, the court must accord at least some special weight to the parent's own determination." *Id.* at 70.[11] Unlike the statute in *Troxel*,

> [t]he Missouri statute carries a rebuttable presumption that custody should be with the parent. We presume parental custody is in a minor child's best interests. To rebut this presumption, the third party seeking custody must carry the burden of showing either that each parent is unfit, unsuitable, or unable to have custody or that the welfare of the child requires third party custody.

*Young v. Young*, 59 S.W.3d 23, 28 (Mo. App. W.D. 2001) (internal quotations omitted); *see Blakely v. Blakely*, 83 S.W.3d 537, 545 (Mo. banc 2002) (distinguishing *Troxel* where Missouri's grandparent visitation statute placed burden on petitioners to prove that parents' denial of visitation was "unreasonable").

*Troxel* also emphasized that the Washington courts had ordered grandparent visitation in that case, even though "there is no allegation that [the children's mother] ever sought to cut off visitation entirely"; indeed, the evidence indicated that the mother was willing to allow the

---

[11]     In an earlier passage, the *Troxel* plurality opinion states that, "so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." 530 U.S. at 68-69. As the passage quoted in the text reflects, however, *Troxel* held only that a court must give the views of a fit parent as to third-party visitation "at least some special weight." *Id.* at 70. We do not read *Troxel* as completely foreclosing a court from ordering third-party custody or visitation over the objections of a fit parent. We note that in *Blakely v. Blakely*, 83 S.W.3d 537 (Mo. banc 2002), and *Barker v. Barker*, 98 S.W.3d 532, 535-36 (Mo. banc 2003), the Missouri Supreme Court held that trial courts had acted consistently with *Troxel* when they ordered grandparent visitation despite the parents' objections, with no reference to the parents' unfitness. *See also Young v. Young*, 59 S.W.3d 23, 28 (Mo. App. W.D. 2001) (concluding, on plain-error review, that *Troxel* does not foreclose the grant of sole custody of child to a grandparent, over parent's objection, based on "welfare" prong of § 452.375.5(5)).

grandparents some – admittedly limited – visitation. 530 U.S. at 71. The Court found it significant that "many other States expressly provide by statute that courts may not award visitation unless a parent has denied . . . visitation to the concerned third party." *Id.*; *see also Blakely*, 83 S.W.3d at 544-45 (distinguishing *Troxel* where Missouri's grandparent visitation statute only allowed grandparents to petition for visitation when they had been "unreasonably denied" visitation for a period exceeding 90 days). In this case, Angela has wholly denied Melissa *any* access to the children; indeed, in this case Angela went so far as to state in a text message that she would call the police if Melissa attempted to see them.

Finally, Melissa is not simply "any third party that comes along." *White*, 293 S.W.3d at 18. In this case, as in *T.Q.L.* and *D.S.K.*, a right of action under § 452.375.5(5) is being asserted by an individual who was specifically invited by a biological parent to act *as a parent* of the children at issue, and in fact acted in that capacity for an extended period of time. This is not a case where custody or visitation rights are being asserted by an extended-family member, a family friend, a paid caregiver, or some other third party who was never requested by the biological parents to function *as a parent* of the children. *Troxel* held that "the constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied." 530 U.S. at 73; *see Blakely*, 83 S.W.3d at 543. The fact that the party seeking custody or visitation in this case previously acted as a parent to the children, at the biological parent's request, further distinguishes this case from *Troxel*. *See Bethany v. Jones*, 378 S.W.3d 731, 736 (Ark. 2011) (distinguishing *Troxel* because in case before it, the party seeking visitation "in all practical respects, was a parent," with the biological parent's encouragement); *Mason v. Dwinnell*, 660 S.E.2d 58, 66-69 (N.C. App. 2008) (similar); *In re Parentage of L.B.*, 155 Wash. 679, 712 (Wash. 2005) (in distinguishing *Troxel*, emphasizing that "a threshold requirement for

18

the status of the *de facto* parent is a showing that the legal parent 'consented to and fostered' the parent-child relationship"); *see also Blakely*, 83 S.W.3d at 544 (noting that Missouri's grandparent visitation statute "avoids the sweeping breadth of the Washington statute" at issue in *Troxel* by limiting the right to seek court-ordered visitation to a child's grandparents); *In re G.P.C.*, 28 S.W.3d 357, 364 (Mo. App. E.D. 2000) (distinguishing *Troxel* where Missouri's grandparent visitation statute "does not create the potential of subjecting parents' every decision to review at the behest of endless third parties").[12]

Under *T.Q.L.*, Melissa has the right to assert her claims for child custody and visitation in an independent proceeding under § 452.375.5(5); indeed, in her briefing Melissa states that she has filed a separate petition for third-party custody under the statute concurrently with this appeal.[13] The availability of a cause of action under § 452.375.5(5) further diminishes the need to adopt the non-statutory equitable parentage doctrine in this case.

Point II is denied.

---

[12] Overruled on other grounds by *Barker v. Barker*, 98 S.W.3d 532, 534 (Mo. banc 2003).

We note that, if a Missouri court ultimately determines to award Melissa custody or visitation rights under § 452.375.5(5), the *magnitude* of the rights granted to Melissa may itself be subject to constitutional constraints. *See Blakely*, 83 S.W.3d at 543-44; *Bryan v. Garrison*, 187 S.W.3d 900, 910-12 (Mo. App. W.D. 2006).

[13] Melissa's Motion asserted that she was entitled to child custody, visitation, and other relief due to her asserted status *as a parent* of the children. The trial court's judgment dismissing her claims without prejudice would not preclude her from asserting a right to child custody or visitation as a non-parent third party, either under § 452.375.5(5), or in a properly-pleaded claim for breach of a child custody or visitation agreement.

In his separate opinion, Judge Clayton argues that we should reverse and remand the present case, to permit Melissa to assert a claim under § 452.375.5(5). Given that Melissa is currently litigating such a claim in an independent action, whether or not this case is remanded would have little or no practical consequence. Moreover, Melissa concedes that she did not assert a claim under § 452.375.5(5) in her motion, Br. at 35, and she never sought leave from the circuit court to amend her motion to assert such a claim. In these circumstances, reversal and remand to allow Melissa to assert a § 452.375.5(5) claim *in this case* is unwarranted.

19

**III.**

In her third Point, Melissa claims that Angela is equitably estopped from denying the parent and child relationship between Melissa and the children. In support, Melissa cites several cases discussing equitable estoppel in the family law context. Melissa acknowledges in her brief that the *White* decision determined that equitable estoppel would not provide the standing needed to seek a declaration of maternity, custody, or support. 293 S.W.3d at 16-17. Melissa attempts to draw a distinction between her case and *White* by stating that she "has standing to bring a breach of contract action to enforce the custody agreement and, independently, she has standing to bring an action as an equitable parent or person *in loco parentis*." We have rejected, however, Melissa's equitable parentage and *in loco parentis* arguments, and have concluded that she failed to adequately plead a claim to enforce any custody agreement. The grounds on which Melissa seeks to distinguish *White* are unpersuasive. Point III is denied.[14]

**Conclusion**

We affirm the judgment of the circuit court, which dismissed without prejudice appellant Melissa McGaw's Motion to Determine Parent-Child Relationship.

_____
Alok Ahuja, Chief Judge

Judge Hardwick concurs.
Judge Clayton concurs in part and dissents in part in separate opinion.

---

[14] We take no position concerning whether the statements or actions on which Melissa relies to support her equitable estoppel claim are relevant in connection with the third-party custody and visitation issues raised in Melissa's pending action under § 452.375.5(5).



# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

MELISSA McGAW,
        Appellant,

v.            **WD77799**

ANGELA McGAW,
        Respondent.  **FILED: AUGUST 18, 2015**

## SEPARATE OPINION CONCURRING, IN PART, AND DISSENTING, IN PART

I concur with the part of the majority opinion concluding that Plaintiff has a right to pursue an independent action under section 452.375.5(5)(a) RSMo Supp. 2011 for custody and visitation of children born during her relationship with Defendant, but I would grant Plaintiff's request and remand this case for a full hearing on the merits. However, in light of the United States Supreme Court's decision in *Obergefell v. Hodges*, 135 S.Ct. 2584 (2015), I believe this matter should be transferred to the Missouri Supreme Court to determine whether, under the circumstances of this case, the above-referenced statutory scheme is "plainly inadequate," in accordance with *Cotton v. Wise*, 977 S.W.2d 263, 264 (Mo. banc 1998), demonstrating a need for the court to exercise its equity powers.

## I.  DISCUSSION

### A. The Relevant Allegations of Plaintiff's Petition

The relevant allegations of Plaintiff's petition, which we accept as true at this stage of the proceeding, are as follows. Plaintiff and Defendant, a same-sex couple, were in a relationship

together from 1995 until January 2007, and the parties lived with one another from 1996 until January 2007. In 1995, Plaintiff and Defendant had initial conversations about having children. In 1997, the parties had a commitment ceremony in Kansas City, Missouri,[1] and in 2000, Defendant permanently changed her name to Plaintiff's. In addition, in February 2001, the parties purchased a home together in Kansas City, Missouri. Beginning in 2002, Plaintiff and Defendant made multiple attempts to have children via insemination, ultimately resulting in Defendant giving birth to two children on March 9, 2004 ("the children").

Between March 2004 and August 2007, Plaintiff "functionally behaved as the children's second parent, sharing equally in child-rearing expenses and acting as sole guardian while [Defendant] worked during the day." In January 2007, the parties agreed to separate and underwent formal mediation which determined visitation, division of debts, and Plaintiff's removal from the household. Mediation also determined that the children would keep Plaintiff's last name. In January 2010, Defendant suggested the parties draft a will with a guardianship clause for the children. Following Plaintiff's and Defendant's separation and until June 13, 2013, the parties followed a set visitation schedule and the parties shared equally in child-rearing activities and expenses. Additionally, after the parties separated, Plaintiff "act[ed] functionally as parent[ ] to the children, including paying for medication and tuition, attending school field trips, and taking the children to various medical and dentist appointments."

[1] Plaintiff makes no allegation the parties ever attempted to marry under the laws of this state or any other state. In addition, the record does not reflect whether marriage was recognized for the parties in any state prior to, during, or after conception of the two children born to Defendant during the course of Plaintiff's and Defendant's relationship. Because this case was filed and argued prior to *Obergefell*, the parties have not fully briefed or argued any constitutional question with respect to the impact of *Obergefell*'s holding that same-sex couples have the fundamental right to marry or with respect to fundamental, constitutional rights which arose from *Obergefell*. 135 S.Ct. at 2599, 2600. The majority suggests Plaintiff has waived her constitutional arguments because she did not make them to the trial court. However, I believe these arguments were not available to the Plaintiff before the trial court. *See Brunner v. City of Arnold*, 427 S.W.3d 201, 217 (Mo. App. E.D. 2013) ("[t]he critical question in determining whether waiver occurs is whether the party affected had a reasonable opportunity to raise the unconstitutional act or statute by timely asserting the claim before a court of law") (emphasis omitted) (quoting *State ex rel. York v. Daugherty*, 969 S.W.2d 223, 225 (Mo. banc 1998)).

Defendant has not allowed Plaintiff to see or talk with the children since June 13, 2013, and on June 18, 2013, Defendant sent Plaintiff a text message indicating, "[The children] will be living at my house until the parenting plan issue is resolved.  I will call the police if you try to come and get them."

Plaintiff's petition is titled as a "Motion to Determine Parent-Child Relationship, Custody, and Visitation."

**B.      Section 452.375.5(5)(a) and an Independent Action for Custody and Visitation**

In 2012, the Missouri Supreme Court issued its opinion in *In re T.Q.L.*, 386 S.W.3d 135 (Mo. banc 2012), declaring that section 452.375.5(5)(a) RSMo Supp. 2011[2] could be pleaded as an independent action for custody and visitation.  This case best represents the current state of the law in parentage, custody, and visitation cases where the parties never married and one party is not a biological parent of the child; however, it does not involve parentage, custody, or visitation questions of same-sex couples.  In *T.Q.L.*, a man ("the plaintiff") who was never married to the child's biological mother, who "acted as [the] [c]hild's father, taking an active role in his life," and who was determined not to be the child's biological father pursuant to a DNA test, filed a petition to determine parentage, custody, and visitation.  386 S.W.3d at 137, 137 n.1.  The plaintiff's petition alleged, (1) the child's biological mother was unfit to be a custodian because of specific alleged acts; (2) the child's unknown biological father was unfit to be a custodian because, *inter alia*, he never came forward to assert his rights as the child's father; and (3) granting custody to the plaintiff would be in the child's best interests.  *Id*. at 138, 139-40.

---

[2] There was legislation, effective August 28, 2011, which amended various subsections of section 452.375 RSMo, but none of those amendments are relevant to this appeal.  Because the RSMo Supp. 2011 version of section 452.375.5(5)(a) discussed in *T.Q.L.* is the same as the current version of section 452.375.5(5)(a), for simplicity purposes all further statutory references to section 452.375.5(5)(a) are to RSMo Supp. 2011.

The child's biological mother filed a motion to dismiss the plaintiff's petition for failure to state a claim, and the trial court granted the motion. *Id.* at 138.

The plaintiff appealed, and the Missouri Supreme Court reversed the trial court's dismissal of the plaintiff's petition on the grounds the petition sufficiently alleged a cause of action for third-party custody pursuant to section 452.375.5(5)(a). *T.Q.L.*, 386 S.W.3d at 137, 139-40. The Court found that pursuant to section 452.375.5(5)(a):

> Third-party custody or visitation may be awarded 'when the court finds that each parent is unfit, unsuitable, or unable to be a custodian, or the welfare of the child requires, and it is in the best interests of the child' so long as the court deems the other person or persons requesting custody [or visitation] 'to be suitable and able to provide an adequate and stable environment for the child.'

*T.Q.L.*, 386 S.W.3d at 139 (quoting section 452.375.5(5)(a)). The Supreme Court held the plaintiff's petition met the requirements of section 452.375.5(5)(a) because the petition alleged the unfitness of the child's biological mother, the unfitness of the child's biological father, and that granting the plaintiff custody would be in the child's best interests. *T.Q.L.*, 386 S.W.3d at 139-40.

Here, like in *T.Q.L.*, there has been no marriage between the parties, and Plaintiff, a party who is not a biological parent, alleges she acted as the children's parent by taking an active role in their lives, and she has filed an action to determine parentage, custody, and visitation. Therefore, I agree with the majority that "[u]nder *T.Q.L.*, [Plaintiff] has the right to assert her claims for child custody and visitation in an independent proceeding under section 452.375.5(5)[(a)]." It is important to note that such an independent proceeding initiated by Plaintiff or a similarly-situated plaintiff could clearly survive a motion to dismiss if there are allegations of unfitness as there were in *T.Q.L.* Alternatively, and less clearly, while *T.Q.L.*'s interpretation of section 452.375.5(5)(a) also allows for an independent proceeding for third-party custody and visitation in situations where "*the welfare of the child requires*," the petition in

4

*T.Q.L.* did not assert any specific factual basis to support these terms, aside from the facts supporting the claim of "unfitness," and the Supreme Court's analysis focused on the facts supporting the "unfitness" prong. *T.Q.L.*, 386 S.W.3d at 137-40. Other than vague, conclusory allegations mirroring the language of the statute, which any third-party could make, potentially violating *Troxel v. Granville*, 530 U.S. 57 (2000), it is unclear what facts would need to be alleged for an independent action to stand under "*the welfare of the child requires*" prong of section 452.375.5(5)(a).

While there are a limited number of cases defining the preceding italicized language of section 452.375.5(5)(a), "the welfare of the child requires,"[3] none have addressed the language in the context of an independent proceeding or as it applies to same-sex couples. Without specific statutory direction from the legislature, courts will continue to face difficult factual circumstances involving the parent-child relationship using these six words. It is the children of same-sex couples who will be most severely affected by being limited in their opportunity to maintain bonds with a party who is not a biological parent but who has, as was alleged in this

---

[3] Cases not involving an independent proceeding under section 452.375.5(5)(a) have interpreted "*the welfare of the child requires*" language of the statute to mean that special or extraordinary circumstances render it in the child's best interests that a third-party be granted custody or visitation. *See T.W. ex rel. R.W. v. T.H.*, 393 S.W.3d 144, 145-46, 150 (Mo. App. E.D. 2013) (involving a grandmother's petition for guardianship and her motion to intervene in biological father's paternity action); *K.S.H. ex rel. M.S.H. v. C.K.*, 355 S.W.3d 515, 516-17, 521 (Mo. App. S.D. 2011) (involving a grandmother's motion to intervene in biological father's paternity action); *Jones v. Jones*, 10 S.W.3d 528, 531-32, 537 (Mo. App. W.D. 1999) (involving a grandmother's motion to intervene in modification of dissolution action); *Flathers v. Flathers*, 948 S.W.2d 463, 464-65, 469-70 (Mo. App. W.D. 1997) (involving grandparents' motion to intervene in dissolution action); *see also Young v. Young*, 59 S.W.3d 23, 24-25, 31 (Mo. App. W.D. 2001) (involving a grandmother's petition for intervention in dissolution action and finding section 452.375.5(5)(a) does not require "*endangerment of* the welfare of the child") (emphasis added). "With respect to what constitutes special or extraordinary circumstances . . . our appellate courts, including this court, have held that a significant bonding familial custody relationship with third parties can constitute a special or extraordinary reason or circumstance rendering it in a child's best interests to award third-party custody." *Flathers*, 948 S.W.2d at 470. Taking Plaintiff's allegations as true and construing them liberally in her favor, which our standard of review requires us to do, *see Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 413-14 (Mo. banc 2014), Plaintiff and the children had a significant bonding familial custody relationship. I agree with the majority that: (1) "[s]ection 452.375.5(5)[(a)], as interpreted by Missouri courts, is limited in important respects that were not present in *Troxel*"; (2) section 452.375.5(5)(a), unlike the statute at issue in *Troxel*, does not permit just "any person" to file an independent proceeding for third-party custody and visitation; and (3) based upon the facts alleged in Plaintiff's petition, including those previously referenced in this footnote, Plaintiff "is not simply any third party that [has] come[ ] along" asserting a right to custody and visitation. (quotations omitted).

5

case, "functionally behaved as the children's second parent." *See Matter of Alison D. v. Virginia M.*, 77 N.Y.2d 651, 657-58 (N.Y. 1991) (Kaye, J., dissenting) (indicating that when statutes are silent with respect to the rights of parties who are not biological or adoptive parents, the impact "falls hardest on the children [born into families with a gay or lesbian parent], limiting their opportunity to maintain bonds that may be crucial to their development").

Because the majority opinion is the first case to suggest the applicability of section 452.375.5(5)(a) under the unique factual circumstances as in this case, I would grant Plaintiff's request to remand. Remand would permit a full hearing on the merits and the potential of full briefing and arguments on fundamental, constitutional rights, which arose from *Obergefell* after this case was dismissed by the trial court.

## C. Equitable-Parent Doctrine

Related to the impact of the unsettled law regarding the rights and remedies available to those persons involved in same-sex relationships is Plaintiff's argument that this Court should adopt what this author will refer to as "an equitable-parent doctrine."[4] An equitable-parent doctrine, which has been set forth and adopted by a majority of the Wisconsin Supreme Court in a case involving a same-sex couple, provides a circuit court has equitable power to determine that a party has a parent-like relationship with a child and that a significant triggering event may justify court intervention in the child's relationship with a biological or adoptive parent. *In re Custody of H.S.H.-K.*, 533 N.W.2d 419, 420-21, 435-38 (Wis. 1995). Pursuant to an equitable-parent doctrine:

> To demonstrate the existence of the petitioner's parent-like relationship with the child, the petitioner must prove four elements: (1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of

---

[4] An equitable-parent doctrine has also been referred to as a "court-fashioned equitable parent doctrine" or an "equitable parenting standard." *See Cotton*, 977 S.W.2d at 265 ("court-fashioned 'equitable parent' doctrine"); *White v. White*, 293 S.W.3d 1, 15 (Mo. App. W.D. 2009) ("equitable parenting standard").

6

a parent-like relationship with the child; (2) that the petitioner and the child lived together in the same household; (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; and (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

To establish a significant triggering event justifying state intervention in the child's relationship with a biological or adoptive parent, the petitioner must prove that this parent has interfered substantially with the petitioner's parent-like relationship with the child, and that the petitioner sought court ordered visitation within a reasonable time after the parent's interference.

*Id*. at 435-36. In addition, if those elements are sufficiently alleged and proven, a court must then determine whether visitation is in the best interests of the child. *Id*.

Thus far, no Missouri case has adopted an equitable-parent doctrine. *See White v. White*, 293 S.W.3d 1, 15, 15 n.8 (Mo. App. W.D. 2009). As correctly noted by the majority, the current state of the law in Missouri, including *White*, *Cotton*, and *T.Q.L.*, justifies the rejection of an equitable-parent doctrine.[5] In *Cotton*, the Missouri Supreme Court held the trial court erred in using a theory of equitable parentage because "[u]nless a statutory scheme is plainly inadequate under circumstances where a court has a duty to act, there is no need for the court to exercise its equity powers to fashion a 'better' remedy that exists in the statutes." 977 S.W.2d at 263-66, 264. In other words, *Cotton* could be read to indicate that Missouri courts should not adopt an equitable-parent doctrine if there is an adequate statutory scheme in place. *See id*. at 264, 265. As indicated in Section B, section 452.375.5(5)(a) may constitute an adequate statutory scheme

---

[5] I disagree with the majority's broad conclusion that "the justification for rejecting an equitable parentage argument is <u>stronger today</u> than at the time *White* was decided" (underlined emphasis added here). While I agree with the majority that *T.Q.L.*, decided after *White*, combined with the holdings in *White* and *Cotton*, justifies rejection of an equitable-parent doctrine, I do not believe *T.Q.L.*, *White*, and *Cotton* stand for rejecting an equitable parentage argument in all circumstances. As discussed below, I believe it may be appropriate for Missouri courts to adopt an equitable-parent doctrine in some circumstances post-*Obergefell*.

which allows Plaintiff to assert her claims for child custody and visitation in an independent proceeding.

However, in light of the decision in *Obergefell*, in which the United States Supreme Court held same-sex couples have the constitutional, fundamental right to marry, 135 S.Ct. at 2599, it is unclear which statutory schemes can be deemed adequate or "plainly inadequate" as they relate to parentage, child custody, and visitation of children born to same-sex couples, whether married or not. Post-*Obergefell*, it is unclear whether state law adequately addresses these issues in Missouri's Uniform Parentage Act, sections 210.817 to 210.852 RSMo,[6] or other areas of the law in Chapter 452 involving Dissolution of Marriage, not to mention the third-party custody and visitation statute section 452.375.5(5)(a) mentioned herein. While *Obergefell* addresses the right to marry, it also pronounced that "choices concerning contraception, family relationships, procreation, and childrearing" are protected by the Constitution and that "'[t]he right to marry, establish a home and bring up children is a central part of the liberty protected by the Due Process Clause.'" 135 S.Ct. at 2599, 2600 (quoting *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978)) (internal quotations omitted).

The most appropriate manner of addressing these issues is with legislative action to provide the statutory direction for courts to tackle these highly sensitive and emotional cases. A legislatively-enacted statutory scheme would provide the most comprehensive path for courts to follow. However, in the absence of legislative guidance, it may be appropriate for Missouri courts to adopt an equitable-parent doctrine when a party to a same-sex marriage or attempted same-sex marriage seeks custody or visitation. *Cf. Cotton*, 977 S.W.2d at 264, 265. Unfortunately, "[t]he problem with a court-fashioned 'equitable parent' doctrine is that the court

---

[6] *See DeWitt v. Lechuga*, 393 S.W.3d 113, 116 (Mo. App. W.D. 2013) (referring to sections 210.817 to 210.852 RSMo as Missouri's Uniform Parentage Act).

8

has to improvise . . . substantive standards and procedural rules about when legal custody may be modified . . .." *Id*. at 265.

Because this case was filed, briefed, and argued at the trial court and at the appellate court, all prior to the decision in *Obergefell*, which establishes a related, fundamental right, I believe transfer is most appropriate for the parties to address these issues and for the Missouri Supreme Court to determine whether the current law is "plainly inadequate" in accordance with *Cotton*.

## II.     CONCLUSION

Based on the foregoing, I concur with the part of the majority opinion concluding that Plaintiff has a right to pursue an independent action under section 452.375.5(5)(a) for custody and visitation of the children born during her relationship with Defendant, but I would grant Plaintiff's request and remand this case for a full hearing on the merits.  However, in light of *Obergefell*, I believe this matter should be transferred to the Missouri Supreme Court to determine whether the above-referenced statutory scheme is "plainly inadequate" under *Cotton*, 977 S.W.2d at 264.


_____
ROBERT M. CLAYTON III, Special Judge